UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MARVIN W. DAVIS #356754          CIVIL ACTION NO. 17-cv-0357

VERSUS          JUDGE FOOTE

DARREL VANNOY          MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

    A six-member DeSoto Parish jury unanimously convicted Marvin W. Davis ("Petitioner") of two counts of aggravated battery. He was also adjudicated a fourth felony offender, with all convictions being crimes of violence, and given a mandatory life sentence. The convictions were affirmed, but the multiple offender adjudication was vacated and remanded. State v. Davis, 121 So.3d 1207 (La. App. 2d Cir. 2013), writ denied, 134 So.3d 1194 (La. 2014). On remand, Petitioner was adjudicated a third felony offender and again given a life sentence. Petitioner also pursued a post-conviction application in state court.

    Petitioner filed a federal habeas petition and asserted claims of (1) insufficiency of the evidence, (2) Batson violation, (3) excessive sentence, (4) error in not allowing prosecution witnesses to refuse to testify, and (5) ineffective assistance of counsel. For the reasons that follow, it is recommended that the petition be denied.

**Sufficiency of the Evidence**

    **A. Elements of the Crime**

Petitioner was convicted of two counts of aggravated battery. A simple battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33. An aggravated battery is one that is committed with a dangerous weapon. La. R.S. 14:34. A dangerous weapon is defined as "including any instrumentality which in the manner used, is calculated or likely to produce death or great bodily harm." La. R.S. 14:2(A)(3). Petitioner argues that the State did not prove the element of a dangerous weapon.

Connie Samuels testified that she had been involved with Petitioner for several years. She and two of her four children had been living in a home with Petitioner for about four years at the time of the incident. The two boys, D.S. and R.S., were about 14 and 10.

Ms. Samuels testified that the younger son, R.S., came into her bedroom and told her that Petitioner "was fussing at him, saying he was gonna kill him." Ms. Samuels added, "But he do that every other day." The dispute apparently arose when Petitioner was cooking and told R.S., who was hanging around in the kitchen, to wash the dishes. The older son, D.S., entered, and Petitioner told him that he was also going to help wash dishes. Ms. Samuels told Petitioner that D.S would not help because it was not his week. She said that it "just went on from there," and she and her older son "blowed up saying he wasn't gonna wash dishes."

Ms. Samuels identified a piece of plastic PVC pipe, a metal pot, and a metal mop handle that Petitioner used in the ensuing attack. Ms. Samuels first said that Petitioner grabbed the PVC pipe "and throwed it up but he didn't hit me with it," but she later

reluctantly admitted that he did hit her with the pipe. She also admitted that Petitioner hit her with the pot "kinda like up beside my head." Ms. Samuels also stated that she was unable to give a written statement to police because her hand had been cut "from the little piece of metal part" when she threw up her hand to "block a lick" from Petitioner.

     Ms. Samuels said that the attack took place, at least at one point, with her and her two sons huddled together in a corner. Petitioner was attacking but hitting only her as she kept the boys behind her. She said he never hit the younger one, but, "the oldest one, yeah. He hit him." D.S. suffered a cut hand, but Ms. Samuels said that it happened when she pushed him back and he hit a glass plate on the stove. She said that EMS workers "just put some peroxide on it and cleaned it up and put a bandage on it, wrapped it with the gauze."

     Ms. Samuels said that the family did not have a phone in their home, so she told one of her sons to jump out a bedroom window and go to a relative's house to call the police. Before the police arrived, Petitioner was apologizing. Ms. Samuels tried to downplay the conflict, but she said on cross-examination that she told her son to go call the police because she did not want Petitioner to hurt them, and she had told her boys that if they were in such a predicament to "always think about your life" and escape without worrying about her. Ms. Samuels admitted that, after police arrived, a friend wrote a statement for her because her hand injury did not allow her to write, and she signed it. That statement indicated that Petitioner hit D.S. in the chest and broke the PVC pipe on him. At trial, however, Ms. Samuels denied that Petitioner hit the boy with the pipe.

     D.S., who was then 15 and in high school, testified at trial. He identified a statement that he had written on the day of the incident, and he read it to the jury:

Page 3 of 20

> I was in my brother room. My brother went to my mom room and said that Marvin Davis pulled a knife and said he was going to kill him. I came in later. He told me to get over there with my mom and brother in a corner. He started to hit us with a mop. The mop broke on my wrist and cut me deep. He hit my mom in the head with a metal pot. I have asthma and he kept hitting me in the chest. I couldn't breathe for a few minutes.

D.S. confirmed in his testimony that he had been injured when Petitioner hit him with the pipe, and he affirmed the truthfulness of his written statement. He also said that he jumped out the window and called the police, at his mother's instruction and because "[t]hings was getting out of hand." D.S. said that Petitioner broke the mop handle when he struck the washing machine with it when he was trying to hit Ms. Samuels. Petitioner hit D.S. with the mop handle after it was broken. Petitioner tried to hit Ms. Samuels with the PVC pipe, but she snatched it from him. D.S. also said that Petitioner hit his mother in the head with a pot from the kitchen. D.S. testified that his wound did not require any medical care beyond what he received at the scene.

R.S. was 11 at the time of the trial. He said that the police were called because Petitioner "held us hostage." R.S. testified that the incident began when he went to the kitchen to wash dishes. Petitioner "pulled out a knife and said I'll kill you kid." R.S. called his mother, and Petitioner eventually forced the mother and two boys into a corner where he "started hitting us with stuff." R.S. then said that Petitioner only hit his mom, and he "used a mop and a water pipe and a boiler." R.S. said his mother would jump in front of the boys and "take the hit and throw her hands up." R.S. said that D.S. did get a cut on his wrist that day, but R.S. did not know how it happened.

Deputy Casey Hicks was the responding officer. Hicks first encountered D.S., who "was in a panic." Hicks said that Ms. Samuels reported that Petitioner hit her with a pot "in the back in the head and the back." She told Hicks that Petitioner hit her with the tin-type mop handle as she tried to get in between him and the children, and when the handle broke, it created a jagged edge that had cut the older boy on the wrist. Hicks confirmed that Ms. Samuels had a neighbor draft her written statement because Samuels' hand was injured and swollen.

### B.  State Court Decision

The court instructed the jury on the elements of aggravated battery for Count 1 (Ms. Samuels), Count 2 (R.S.), and Count 3 (D.S.). Tr. 116. The jury instructions mentioned the alleged dangerous weapons as a mop handle and/or a metal pot. The jury returned verdicts of guilty on Counts 1 and 3, but not guilty on Count 2. Tr. 124.

Petitioner argued on direct appeal that the items he used were not dangerous weapons under the law. The appellate court noted that the law defines a dangerous weapon as including any instrumentality, which in the manner used, is calculated or likely to produce death or great bodily harm. Whether a weapon is dangerous is a factual issue for the jury to determine after considering the character of the weapon and also "by whom, upon whom, and in what manner it was used." State v. Davis, 121 So.3d at 1210. Louisiana appellate courts have held several everyday items to constitute a dangerous weapon in the manner used. Those items include a stick, a tennis shoe worn while kicking the victim, a pipe, a paint can, a bottle, a mop handle, and a pen. Id. See also State v. Lee, 243 So.3d 1133, 1141 (La. App. 2d Cir. 2017) (collecting cases).

The appellate court reviewed the relevant evidence, including statements from the victims that Petitioner made threats to kill and cornered the three victims while striking at them with various objects that actually injured two of them. The court found that the jury could have reasonably inferred from the evidence that Petitioner intended to cause death or great bodily harm through his use of the items. The evidence was found sufficient under Jackson v. Virginia, discussed below.

**C. Analysis**

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993). And "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a

sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

Plaintiff argues that the actual injuries suffered by the two victims were not that serious and did not require hospitalization or treatment beyond that offered by the EMS workers who responded to the scene. It is not the extent of injury, however, that determines whether an item is a dangerous weapon. The evidence here included a threat by Petitioner to kill one of the boys, followed by him cornering a woman and two children and beating them with three items. The weapons included a metal pot that he used to strike Ms. Samuels in the head and a metal mop handle that Petitioner swung hard enough to break over a stove before using it to strike D.S. The beating was downplayed by Ms. Samuels at trial, but she was concerned enough at the time to ask her son to jump out a window and call the police.

Considering the use of the items by the adult male in the household on a woman and two children, and the injuries and fear that the attack caused, the jury was reasonable to determine that the items used were dangerous weapons under state law. Petitioner has offered what might be a reasonable argument to make to a jury, but the jury has now returned its verdict, and it has been affirmed by the state court. At this stage, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." Cavazos, 132 S. Ct. at 4. "The federal court instead may do so only if the state court decision was

'objectively unreasonable.'" Id. The state court decision in this case was entirely reasonable, so habeas relief is not permitted on this claim.

**<u>Batson</u> Challenge**

The court summoned 18 potential jurors, from which six were selected. Of the 18, all were white except for M.W. (a black male) and M.H. (a black female). Tr. 205. Ron Stamps, an African-American prosecutor, used his peremptory challenges to exclude both of the black prospective jurors and some white prospective jurors. Defense counsel raised a challenge pursuant to <u>Batson v. Kentucky</u>, 106 S.Ct. 1712 (1986), which the trial court denied. Petitioner raised the issue on direct appeal, and the trial court's decision was affirmed. He now asserts the claim as a habeas challenge.

M.W. was asked during voir dire if there was anything about Petitioner that would prevent M.W. from convicting him if the State proved its case beyond a reasonable doubt. M.W. said that Petitioner "looks like somebody I know," and he explained that the person was his aunt's husband's brother. He was asked if that would prevent him from convicting Petitioner, and M.W. answered, "Yes, I believe it would." The prosecutor then spoke with other prospective jurors about any obstacles they would have to returning a guilty verdict. He then wrapped up by saying that he asked only that the jurors go by the evidence. When he asked M.W. if he could do that, M.W. answered, "Yes sir." Tr. 240-41.

The following colloquy took place between counsel and the trial judge when the state challenged Juror M.W. for cause:

> District Attorney: Judge, I'm a little bit concerned about [MW]. He kind of vacillated back and forth on knowing, looking at the guy, you know, he couldn't convict him. And, you

|  |  |
|---|---|
|  | know, I think it's about him not wanting to serve more than anything else. |
| The Court: | He also tried to get off for another reason and I wouldn't let him off, a non-medical reason. |
| District Attorney: | And I think it's problematic because he is looking for a reason. I asked him if we prove the case, he said no. You know, I'm just concerned about him. |
| The Court: | Well, unfortunately, I think you rehabilitated him, so that's denied. |

Regarding a challenge for cause as to juror MH, the following colloquy took place:

|  |  |
|---|---|
| District Attorney: | Okay. [M.H.], Judge. Just inattentive, sleeping. |
| The Court: | I was a little concerned about her. She really didn't really seem too much engaged. What do you think about her? (to defense counsel) |
| Defense counsel: | I thought totally opposite. She looked at [the DA] when he was talking. She looked at the screen— |
| The Court: | I want to make sure, that's 13? |
| District Attorney: | Yes. She was sleeping. |
| Defense counsel: | No. She responded to the questions he asked. When he changed the screen, she looked at it. If he had an issue, he should have asked her more questions. I thought she was good. |

In denying the challenge for cause as to juror M.H., the trial judge noted that "different jurors have different affects and her answers were, of course, very appropriate." The prosecutor later used two of his peremptory challenges to strike M.H. and M.W.

Batson provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: First, a defendant must make a prima facie

Page 9 of 20

showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008).

The state appellate court reviewed the evidence and recited the Batson requirements. The trial judge had found that the defense had not made a prima facie showing that the peremptory challenges were exercised on the basis of race. The appellate court found that to be "a difficult question statistically and otherwise." But the appellate court found that it was not necessary to address that issue because it found "no error in the trial court's further determination that the state provided race-neutral reasons during the challenges for cause for excluding these two potential jurors." State v. Davis, 121 So.3d at 1215. The prosecutor and the judge had expressed concern about M.W.'s desire not to serve on the jury and his statement that he may not be able to convict the defendant because he resembled someone M.W. knew. As for M.H., both the prosecutor and the judge expressed concern about her inattentiveness and sleeping, although the defense disagreed. The appellate court found those reasons were not inherently discriminatory and sufficed as race-neutral reasons for the peremptory challenges. Id.

The trial and appellate courts made implied findings that Petitioner had not shown purposeful discrimination at step three of the Batson analysis. At step three, the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. And the "race-neutral reasons for peremptory challenges often invoke a

juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance." Snyder, 128 S.Ct. at 1208. For these reasons, a trial court's ruling on the issue of discriminatory intent must be sustained on appeal unless it is clearly erroneous. Snyder, citing Hernandez v. New York, 111 S.Ct. 1859 (1991). The Supreme Court has said that it will defer to the trial court on such findings "in the absence of exceptional circumstances." Snyder, quoting Hernandez, 111 S.Ct. at 1870.

This habeas court must also review the state court's decision under the deferential standards of 28 U.S.C. § 2254(d). To prevail under that standard, the petitioner must show that "[the] trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary." Rhoades v. Davis, 914 F.3d 357, 378 (5th Cir. 2019). The state court's decision in this case followed the Batson requirements and was a reasonable, though perhaps debatable, assessment of the record evidence. There is certainly not clear and convincing evidence that would undermine the state court's decision and warrant habeas relief. This claim lacks merit.

**Excessive Sentence**

    **A. Introduction**

Petitioner was adjudicated a fourth felony offender and given a mandatory life sentence. The habitual offender adjudication was vacated on appeal because the two crimes of which Petitioner was convicted in this case could not each be counted. On remand, Petitioner was adjudicated a third felony offender and again given a mandatory

life sentence. Petitioner argues in his federal petition that the sentence is disproportionate to the crime in violation of the Eighth Amendment.

### B. Exhaustion

Petitioner did not raise this claim on direct appeal or in his post-conviction application. An application for federal habeas relief shall not be granted unless the applicant has exhausted the remedies available in the state courts. 28 U.S.C. § 2254(b)(1)(A). The State acknowledges in its brief that Petitioner argues this claim "for the first time" in his federal petition, but the State has not asserted an exhaustion defense.

The State shall not be deemed to have waived the exhaustion requirement unless, through counsel, it expressly waives the requirement. § 2254(b)(3). The State's memorandum concedes under the heading "Exhaustion of State Remedies and § 2254" that the State "submits that Mr. Davis has exhausted state remedies by appealing and seeking redress through post-conviction proceedings in state court." Accordingly, the exhaustion defense has been waived.[1]

---

[1] It is not enough to simply pursue an appeal or post-conviction application to exhaust state remedies. The petitioner must, in one of those proceedings, fairly present each federal law claim to the appropriate state courts and afford them an opportunity to pass upon and correct the alleged violation of a federal right. Baldwin v. Reese, 124 S.Ct. 1347, 1349 (2004). The determination of whether a claim was exhausted is made by looking to the briefs filed by the petitioner in state court (which is why the court orders the State to file copies of the appeal and post-conviction briefs in the record lodged in the federal court). Dye v. Hofbauer,126 S. Ct. 5, 6 (2005). Each particular habeas claim must first be exhausted. Even omission of a claim from a petition for discretionary review with the state's high court leaves a claim subject to an exhaustion defense. O'Sullivan v. Boerckel, 119 S.Ct. 1728, 1732 (1999).

### C. Analysis

The Supreme Court has reviewed a number of lengthy sentences for multiple offenders. The best case for Petitioner is Solem v. Helm, 103 S.Ct. 3001 (1983), which struck down a sentence of life without parole for a man who was convicted of writing a "no account" check for $100 and who had three prior convictions for third-degree burglary, one prior conviction for obtaining money under false pretenses, one prior conviction of grand larceny, and one prior conviction of third-offense DWI. The majority found the sentence was significantly disproportionate to the crime, and Solem prevailed.

"In other cases, however, it has been difficult for the challenger to establish a lack of proportionality." Graham v. Florida, 130 S.Ct. 2011 (2010). In Harmelin v. Michigan, 111 S.Ct. 2680 (1991) the offender was sentenced to life without parole for possessing a large quantity of cocaine. A closely divided Court upheld the sentence. Another closely divided Court rejected a challenge to a sentence of 25 years to life for the theft of a few golf clubs under California's three-strikes statute. Ewing v. California, 123 S.Ct. 1179 (2003).

The Court in Lockyer v. Andrade, 123 S.Ct. 1166 (2003) reviewed its decisions and rejected a habeas attack on two consecutive terms of 25 years to life for a third-strike conviction. The petitioner had a string of burglary, drug, and property-crime convictions, capped by felony petty-theft after he stole approximately $150 worth of videotapes. The sentence did not permit habeas relief under Section 2254(d) because it was not contrary to or an unreasonable application of clearly established gross disproportionality principle set forth in Supreme Court holdings.

A determination of whether a sentence is grossly disproportionate for a particular crime begins by comparing the gravity of the offense and the severity of the sentence. Graham, 130 S.Ct. at 2022. The habitual offender bill of information (Tr. 22-23) reflects that Petitioner's first felony conviction was manslaughter in 1995 for which he received a 10-year sentence. His second felony conviction was second-degree battery, to which he pleaded guilty in 2004 and was sentenced to three years at hard labor. His third felony would be one of those returned in this case. Petitioner states in his brief that he was 47 years old at the time he received the mandatory life sentence without benefit of parole. The sentencing judge, at the original sentencing, did not give any reasons other than the sentence was mandatory. Tr 129-38. The record does not appear to include a transcript of the re-sentencing on remand, but the same life sentence was mandatory.

Petitioner was given multiple opportunities to straighten out his life and quit committing felonies, but even in his late 40s he could or would not stop engaging in acts of violence. His conviction in this case was for domestic violence that netted two convictions but which terrorized three family members. Their fear was all the more reasonable, given Petitioner's prior conviction for manslaughter and his threat to kill one of the children. The sentence was harsh, but that is what was deserved in these circumstances. Petitioner has not shown that his sentence is grossly disproportionate to sentences received by other multiple offenders in similar settings. Louisiana routinely sentences habitual offenders to life sentences, even when the prior convictions have not involved violence to the extent found in Petitioner's record. There was no state court decision of this issue, so no deference is due under Section 2254(d). But even under a *de*

*novo* review, Petitioner has not demonstrated an Eighth Amendment violation that would entitle him to habeas relief from his life sentence.

**Requiring Witnesses to Testify**

Ms. Samuels testified at trial, but she expressed reluctance because of the potential consequences for Petitioner. The prosecutor asked her why she asked her son to call the police, and Samuels responded:

> Well, sometimes things get out of hand and I just did. But, I really, I don't want to testify to what I said and done back then. I really didn't make a statement back then. I allowed my kids to make one but I didn't make one. And I don't care to testify now against this because where y'all going – Marvin's not a bad person.

Tr. 41. The prosecutor later asked Ms. Samuels if she had been "very reluctant to come here and testify," and she said yes. She said that Petitioner was not a bad person to her, and she had asked him to help discipline her kids because they were the rowdy type. She added, "Well, my testimony, I don't want to testify against him because I don't feel like he deserves life." Tr. 44. When D.S. took the stand, the prosecutor mentioned that his mom had said she did not want to testify at the trial. D.S. answered, "I don't either."

Petitioner argues that the prosecutor engaged in misconduct by misleading and forcing witnesses to testify when they did not want to do so. He also faults the trial judge for not ordering a mistrial as a result. Petitioner raised this claim in his post-conviction application (Tr. 174-75), and the trial court entered an order that summarily denied the entire application on the grounds that it had "no basis in fact or in law and the defendant is not entitled to the relief prayed for." Tr. 166. Petitioner filed a writ application with the appellate court, which entered an order that: "Upon the showing made, the writ is denied."

Tr. 189. The Supreme Court of Louisiana denied a writ application in a per curiam opinion that stated Petitioner had failed to satisfy his burden of proof. Petition, Ex. F.

Improper questions or arguments by a prosecutor do not provide a basis for habeas relief unless the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986). The petitioner must also demonstrate prejudice by showing that the misconduct was so persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks. Geiger v. Cain, 540 F.3d 303, 308 (5th Cir. 2008); Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988).

The prosecutor in this case allowed the witnesses to express their reluctance to testify, but there is neither indication in their testimony nor record evidence to indicate that the prosecutor threatened or intimidated the witnesses in any way to make them testify. The witnesses did express reluctance, but they nonetheless testified about their experiences. Petitioner has not demonstrated a basis for habeas relief with respect to the actions of the prosecutor or the court in connection with this issue.

**Ineffective Assistance of Counsel**

Petitioner argues that defense counsel Pete Kammer was ineffective because he failed to investigate and learn that Ms. Samuels "never wanted to testify and that the prosecutors had threatened to take her children if she did not testify against Petitioner." Petitioner also argues that counsel allowed the prosecutor to lead witnesses, did not object to inconsistent statements, and should have asked for a mistrial when the witnesses expressed reluctance to testify. He also claims that counsel was ineffective during the

habitual offender proceedings because he did not object to evidence of the prior guilty pleas being introduced without proof that they were made in compliance with Boykin.

Petitioner raised his ineffective assistance of counsel claim in his post-conviction application, which was denied on the merits in the decisions cited above. Accordingly, 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 131 S.Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Id. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. And review of a Strickland claim under Section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). It is reversible error for a federal district court to hold a federal hearing to flesh out such a claim. Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011).

Petitioner did not present any evidence in the state or federal proceedings to support his conclusory asserted that the prosecutors threatened Ms. Samuels with taking

her children if she did not testify. Petitioner also fails to cite any portions of the transcript to support his claims that counsel allowed the prosecutor to lead witnesses or did not object to inconsistent statements. The record instead reflects that Mr. Kammer did a good job of cross-examining the witnesses, getting them to admit the lack of need for additional healthcare, getting Ms. Samuels to say that she did not believe Petitioner intended to hurt her or her boys, and getting Ms. Samuels to describe how the family reconciled even before police arrived. Petitioner argues that counsel should have asked for a mistrial based on witness reluctance, but he points to no legal basis for a mistrial when a witness expresses reluctance but nonetheless elects to testify.

As for the prior guilty pleas, defense counsel in Louisiana courts routinely review available transcripts and minutes related to the prior convictions before a multiple offender hearing and determine whether Boykin objections exist that may be raised under the framework of State v. Shelton, 621 So.2d 769 (La. 1993). The State has not included in the record the exhibits from the multiple offender hearing, which could put the issue to rest with certainty, but Petitioner has also failed to point to a transcript or minutes that would indicate there was a basis to raise such an objection. Petitioner bears the burden of proof with respect to his habeas petition, and he has not met it with respect to this final claim. "[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000).

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied and dismissed with prejudice.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 5th day of November, 2019.

Mark L. Hornsby
U.S. Magistrate Judge